IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00714-MEH

ANGELIQUE MURDOCK,

      Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff Angelique Murdock appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability and disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal. After consideration of the parties' briefs and the administrative record, the Court reverses the ALJ's decision and remands the matter to the Commissioner for further consideration.

## BACKGROUND

### I.  Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying her application for DIB filed on January 15, 2010; Plaintiff claims benefits for the period of her disability onset,

November 15, 2005 through her date of last insurability, March 31, 2008. [Administrative Record

("AR") 292-295]  After the application was initially denied on June 6, 2010 [AR 174-176], an

Administrative Law Judge ("ALJ") scheduled a hearing upon the Plaintiff's request for November

29, 2011 [AR 197-200].  At the hearing, the Plaintiff, a medical expert, and a vocational expert

testified. [AR 78-120]  The ALJ issued a written ruling on January 12, 2012 finding Plaintiff was

not disabled during the period November 15, 2005 to March 31, 2008 because Plaintiff could

perform three of her past jobs considering her age, education, work experience and residual

functional capacity. [AR 151-162]  On June 18, 2013, the SSA Appeals Council remanded the case

to the ALJ for assessing a residual functional capacity for light work without explanation and despite

the medical expert's opinion that Plaintiff could perform sedentary work. [AR 167-169] The ALJ

then set another hearing for October 10, 2013 at which the Plaintiff and a vocational expert testified.

[AR 38-76] The ALJ issued a second opinion on November 8, 2013 finding Plaintiff was not

disabled during the period at issue because she could perform two of her past jobs. [AR 15-37]  The

SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's

determination on February 9, 2015, making the SSA Commissioner's denial final for the purpose

of judicial review [AR 1-3].  *See* 20 C.F.R. § 416.1481.  Plaintiff timely filed her complaint with this

Court seeking review of the Commissioner's final decision.

## II.   Plaintiff's Alleged Conditions

Plaintiff was born on November 7, 1969; she was 40 years old when she filed her application

for DIB on January 15, 2010.  [AR 331-335]  Plaintiff claims she became disabled on November 15,

2005 [*id.*] and reported that she was limited in her ability to work due to her multiple sclerosis and

seizures.  [AR 337]  Plaintiff's "caregiver," Louis Repstine, completed several questionnaires in May 2010 in tandem with Plaintiff's application, in which he described Plaintiff as having grand mal seizures approximately 12 times per year during which she loses consciousness and bodily control; the seizure medication also causes her to be dizzy, lose her balance, and have blurred vision.  [AR 348]

In addition, Plaintiff experienced radiating pain, loss of memory, and confusion that kept her from doing "anything for any length of time" [AR 349-350], including dressing, bathing, cleaning the house, driving, shopping, taking medication, and feeding herself. [AR 351-358]  The caregiver helped with these activities in addition to caring for Plaintiff's daughter and dog. [*Id.*] Plaintiff was able to use the toilet and telephone people on a daily basis. [*Id.*]

The record (relevant for the time period at issue, November 15, 2005-March 31, 2008) indicates that from February 3-8, 2005, Plaintiff was admitted to Littleton Adventist Hospital for tests; she was then diagnosed with multiple sclerosis and seizure disorder. [AR 999-1000]  She was discharged with medication and appeared to be "in good spirits, walking well, and thought to be stable for discharge."  *Id.*  On February 14, 2005, Plaintiff presented to a neurologist, Beverly Gilder, M.D., for treatment; she reported to Dr. Gilder that after she left the hospital, she could not walk and experienced significant pain. [AR 532-534] Dr. Gilder noted that Plaintiff had historically suffered from migraine headaches - 12 per month - and was very distressed and emotional.  The doctor concluded that Plaintiff had a "strong probability of developing multiple sclerosis," she "needs to be on immunomodulating therapy," and Plaintiff's "emotionality and depression" were likely "related to the steroids" she received at the hospital.  [*Id.*]

3

Dr. Gilder continued to see Plaintiff through the end of 2005 at which time Plaintiff complained of severe, continued pain, so the doctor ordered MRI scans of the head and spine; only the spine was completed and "showed no spinal cord lesions suggestive of MS" so the doctor ordered another brain scan. [AR 524-525] On March 13, 2006, Dr. Gilder reported that the MRI scan of Plaintiff's brain "shows by the report no worsening since her previous study, neck shows resolution of a couple of lesions. Nothing enhances. This is very reassuring." [AR 522-523] Two months later, Plaintiff reported to Dr. Gilder that "[s]he overall is feeling improved and better and her pain is under control," but her "biggest complaint is continued dizziness." [AR 521]

In June 2006, Plaintiff presented to the emergency room at the Medical Center of Aurora with weakness and dizziness; the provider concluded that she likely had taken too much Tegretol (for seizure disorder). [AR 893-895] Plaintiff reported to the provider that she had "been seizure-free for several years" and the provider noted it was "unlikely" that Plaintiff had experienced an exacerbation of her MS. [*Id.*] However, in August 2006, Plaintiff presented to the emergency room at Littleton Hospital at which time she underwent another MRI brain scan; the impression was "moderate multiple sclerosis" and it was noted that "a new left frontal subcortal lesion" had appeared since February. [AR 923] Later that month, Plaintiff presented to Dr. Gilder, who determined Plaintiff had experienced an exacerbation of her MS and discussed with Plaintiff the possible need to see an "ENT" for her dizziness. [AR 517]

The next record is from Plaintiff's meeting with Dr. Gilder on February 1, 2007; Plaintiff reported that her symptoms had "worsened," but the doctor "reassured the patient that her examination looks fairly normal at this point" and suggested some changes to Plaintiff's medication.

4

[AR 515] Then, in July 2007, Plaintiff saw Dr. Gilder and told her she was "actually feeling better than previously," but was having migraines three days per week. [AR 514]  However, on October 18 2007, Plaintiff reported she was feeling worse with "aches everywhere" and "headaches" [AR 513]; the doctor ordered another MRI brain scan, which revealed "white matter lesions without associated enhancement ... no acute lesions identified."  [AR 917]  Two days later, Plaintiff presented to Littleton Hospital where she was treated for an MS "flare" and dehydration.  [AR 966-980] Dr. Gilder saw Plaintiff in November 2007 and concluded Plaintiff had likely experienced an MS exacerbation in October.  [AR 511]  The following month, December 2007, Plaintiff fell down the stairs and fractured her left ankle; she was discharged with medication, crutches and a walker boot. [AR 937-938; 886-892]

Plaintiff saw Dr. Gilder again in February, May, August, October, and December 2008; Plaintiff's symptoms appeared to remain consistent (pain, weakness, dizziness) throughout this time, except for some left shoulder pain in late 2008.  [AR 504-510]  The doctor noted that she "explained to the patient that she is not taking the medications appropriately" and made suggestions for medication changes to improve the Plaintiff's symptoms. [*Id.*]

On May 19, 2010, Plaintiff presented for a consultative psychological evaluation with Aimee Henley, Ph.D. in accordance with Plaintiff's social security benefits application. [AR 535-538] Plaintiff reported that she had experienced three MS flare-ups in 2008, 4-5 flare-ups in 2009, and four grand mal seizures in the previous four months. [*Id.*] Plaintiff stated "the MS and seizure disorder were her only known medical problems."  She also reported she last worked "three years ago" and "was in and out of the hospital at the time and could not maintain her work load."  [*Id.*]

5

Dr. Henley noted, "Ms. Murdock's records indicated anxiety was a problem, but she did not report these symptoms." [*Id.*]  After conducting a mental status examination, Dr. Henley diagnosed Plaintiff with "major depressive disorder, recurrent, moderate" and assessed a Global Assessment of Functioning (GAF) score of 50.[1]   [AR 537]  Dr. Henley concluded:

---

[1]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:

The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home,

The claimant displayed cognitive impairments during the mental status examination, including in recent memory, remote memory, fund of knowledge, attention and concentration, and ability to think abstractly. *This was likely a decline from her level of functioning before the MS and seizure disorder worsened.* Her major obstacle to working successfully are the physical and mental effects of the MS and seizures. Attention and concentration are likely moderately impaired, persistence and pace may be significantly impaired. Her ability to adapt to change is likely mildly impaired. Her ability to cope with additional stress is likely moderately impaired. She may have difficulty managing her own funds. Recommendations for this claimant include continuing to seek treatment for her MS and seizures. Her treatment providers were aware of her complicated medication regimen and at least one note indicated an intention to reduce the number of medications she was on. She might want to seek psychotherapy as a complimentary [sic] treatment for the depressive symptoms. A health psychologist who specializes in working with people with MS would be ideal. A support group would also be a good idea.

[AR 538 (emphasis added)] Following Dr. Henley's evaluation, an SSA reviewing examiner, Mary Ann Wharry, Psy.D., reviewed the evidence provided on June 7, 2010, and concluded there was "insufficient evidence to substantiate the presence of a [psychological] disorder" for purposes of meeting the "A," "B," and "C" criteria of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [AR 128]

### III.    Hearing Testimony

On November 29, 2011, Plaintiff, a medical expert, Ronald Devere, and a vocational expert, Ashley Bryars, testified at the initial hearing.  [AR 78-120] The ALJ first clarified that the time

---

or friends)."

• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."

• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."

• 0: "Inadequate information."

7

period at issue was November 15, 2005-March 31, 2008. [AR 80-81] Plaintiff testified that from

2005 to March 2008 her overall condition continually got worse [AR 89-90]; in early 2008, she was

using a walker periodically (to go out), which was prescribed by Dr. Gilder in 2007; she did not

know why the prescription of the walker was not in Dr. Gilder's notes; during the same time period,

she could not remember things, could not read very well, could not focus, start tasks and fail to

finish them; she had to make notes to help her remember; she did not really remember things that

happened in 2008, like going to the emergency room in July 2008; she relied on her walker more

often than in 2007; she was able to work at a desk job in 2005 and 2006, but in early 2007 her

condition worsened so that she could no longer work; she was able to ski at the end of 2006 and to

hike in mid-2007; she stopped driving by the end of 2007; and she completed three years of college

after high school.  [AR 103-118]

The medical expert, Dr. Devere, a board certified neurologist, testified that there was no

evidence supporting the listing of 11.09, particularly in that there was "no evaluation by cognitive

testing" and "any cognitive symptoms she was having then was not even addressed."  [AR 91-92]

"Yes, there's lots of symptoms. But that wouldn't change, in my opinion, the possibility of a listing

based on symptoms alone."  [AR 98]  Dr. Devere also stated that he "would expect a lot more

neurologic findings in 19 lesions ... I bet there's a cognitive disorder. But that was never evaluated.

No, she never had neuropsych testing."  [AR 101-102]  The doctor then opined that Plaintiff could

perform sedentary work during the relevant time period.  [AR 93]

The ALJ then turned to the vocational expert, Ms. Bryars, who had provided a work history

report reflecting three job titles the Plaintiff had previously performed: computer aided design

technician, customer service manager, and personnel recruiter. [AR 376] Ms. Bryars testified that

an individual with Plaintiff's age, experience and education – and the ability to perform a full range

of light work, except no climbing of ladders, scaffolds, or ropes; no exposure to unprotected heights;

and no driving automotive equipment or vehicles as part of the job – could perform all of the

Plaintiff's past jobs.  [AR 121]  With the modified limitation of sedentary work only, Ms. Bryars

testified that the individual could perform the customer service manager position and personnel

recruiter position.  [AR 121-122]  She also testified that the individual could not be absent or leave

work early more than 1-2 times per month and could not be "off-task" more than 25% of the time.

[AR 122]

The ALJ issued an unfavorable decision on January 12, 2012; however, as set forth above,

the decision was remanded by the Appeals Council on June 18, 2013.  Accordingly, the ALJ set a

second hearing for October 10, 2013 at which the Plaintiff and vocational expert, Jamie Massey,

testified.  [AR 38-75]  Plaintiff testified that the steroid infusions Dr. Gilder prescribed in 2005

caused her to be unable to walk; she suffers from "relapsing, remitting" MS where she has flare-ups,

then improves for a period of time; Dr. Gilder kept changing medications and dosages to find what

worked; she could not work because she became so dizzy; from 2005-2008, she used a cane on and

off depending on how weak she felt; she also had a wheelchair for long-term excursions, but she

rarely used it (once a month) because she mostly stayed home; her relapses would last for six months

to a year; she had double-vision and suffered from fatigue, lack of focus, tremors, spasms, and

headaches daily; her daily activities included staying in bed, walking around the house, and

occasionally going out with her family; she could sit and stand for 15-30 minutes at a time; she

9

could not lift or carry anything, except her cane; she was in the middle of a seizure at the last hearing and felt very confused; and she could walk one-and-a-half to two blocks.

The vocational expert, Ms. Massey, testified that an individual with Plaintiff's age, experience, education, and having performed the three past jobs referenced in the first hearing – and the ability to lift 10 pounds occasionally; less than 10 pounds frequently; and, in an 8-hour workday, to stand and/or walk two hours and sit six-plus hours; but no climbing of ladders, scaffolds, or ropes; no exposure to unprotected heights; and no driving automotive equipment or vehicles as part of the job – could perform the Plaintiff's past jobs of customer service manager and personnel recruiter. [AR 72-73]  Ms. Massey also stated that an individual who was 20% off-task could not maintain employment.  [AR 74]

The ALJ issued an unfavorable decision on November 8, 2013.

## LEGAL STANDARDS

To qualify for benefits under section 216(i) of the SSA, an individual must meet the insured status requirements of this section, be under age 65, file an application for DIB for a period of disability, and be "disabled" as defined by the SSA.  42 U.S.C. §§ 416(i), 1382. Additionally, SSI requires that an individual meet income, resource, and other relevant requirements.  *See* 42 U.S.C. § 1382.

## I.    SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity. If she is, disability benefits are denied. *See* 20 C.F.R. § 404.1520. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 404.1520(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. *See id.* Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. § 404.1520(d). If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(e), (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. *See* 20 C.F.R. § 404.1520(g).

## II.      Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.   *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).   Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).   "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).   The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ.   *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).   However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.   *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

### ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity from the onset date of her disability, November 15, 2005, through her date last insured, March 31, 2008  (Step One).  [AR 20]  Further, the ALJ determined that Plaintiff had the following severe impairments: multiple sclerosis (relapsing, remitting type), and a left ankle disorder (Step Two).  [AR 21]  Next,

the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three).  [AR 21-22]

The ALJ then determined the Plaintiff had the RFC to perform sedentary work as defined by 20 C.F.R. 404.1567(a); she could lift 10 pounds occasionally and less than 10 pounds frequently, stand and/or walk for two hours in an eight-hour workday, and sit for six or more hours in an eight-hour workday; but she could not climb scaffolds, ladders, and ropes, work at unprotected heights, or operate motor vehicles and equipment.  [AR 22]  The ALJ found the "medical record shows that the claimant was diagnosed with multiple sclerosis in February 2005" and "that prior to the date last insured the claimant's multiple sclerosis would not have precluded sedentary work. "  [AR 23]

The ALJ proceeded to determine the Plaintiff was capable of performing past relevant work as a customer service manager and personnel recruiter (Step Four).  [AR 30]  As a result, the ALJ concluded that Plaintiff was not disabled at Step Four and, therefore, was not under a disability as defined by the SSA.  [AR 31]

Plaintiff sought review of the ALJ's decision by the Appeals Council on January 8, 2014. [AR 12-14]  On February 9, 2015, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security."  [AR 1-3]  Plaintiff timely filed her Complaint in this matter on April 7, 2015.

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors: (1) the ALJ failed to consider all of

Plaintiff's medically determined impairments and the combined effects of all impairments; (2) the

ALJ failed to properly evaluate the medical evidence and medical source opinions as required by

20 C.F.R. § 404.1527; and (3) substantial evidence does not support the ALJ's credibility

determination.

## ANALYSIS

The Court will address the Plaintiff's stated issues in turn.

## I.      Consideration of Each Impairment and Combination of All Impairments

Plaintiff contends that the ALJ failed to impose restrictions resulting from her mental

impairments in the RFC.  Particularly, Plaintiff contends that the ALJ's rejection of Dr. Henley's

opinion contravened the principles described in SSR83-20; the ALJ should have afforded more

weight to Dr. Henley's opinion (as an examining physician) than to Dr. Wharry's opinion (as a non-

examining physician); the ALJ failed to fully evaluate the impact of Plaintiff's mental impairments

on her ability to perform basic mental work tasks on a sustained basis; and, the ALJ failed to

consider Plaintiff's documented migraine headaches.

Pursuant to 20 C.F.R. § 404.1520(a)(4)(ii), at the second step of the sequential evaluation

process, an ALJ is required to determine whether a medically determinable impairment may be

classified as severe and whether such impairment meets the duration requirement of 42 U.S.C. §

423(d)(1)(A), which provides:

(1) The term "disability" means--

(A) inability to engage in any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to result in death
or which has lasted or can be expected to last for a continuous period of not less than

14

12 months.

"A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508.  Section 404.1508 provides that a claimant's "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."  More specifically, "symptoms" are the claimant's description of his/her own physical or mental impairments; "signs" are anatomical, physiological, or psychological abnormalities that can be observed apart from symptom descriptions and must be shown by medically acceptable clinical diagnostic techniques; and "laboratory findings" are anatomical, physiological or psychological phenomena that can be shown by use of medically acceptable laboratory diagnostic techniques.  20 C.F.R. § 404.1528.

An ALJ's omission of an impairment altogether could be reversible error.  "It is beyond dispute that an ALJ is required to consider all of the claimant's medically determinable impairments, singly and in combination; the statute and regulations require nothing less. ... Further, the failure to consider all of the impairments is reversible error." *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006) (citations omitted); *see also Wells v. Colvin*, 727 F.3d 1061, 1069 (10th Cir. 2013) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)) ("In his RFC assessment, the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not.") (emphasis in original).

Here, the Plaintiff contends the ALJ not only failed to classify Plaintiff's mental impairments and migraines as "severe," but also failed to consider them as "medically determinable

15

impairments." Accordingly, the first question here is whether the omitted impairments are "medically determinable." *See Salazar*, 468 F.3d at 621 (finding borderline personality disorder was a medically determinable impairment that the ALJ should have identified and assessed at Step Two); *see also Elliott v. Astrue*, 507 F. Supp. 2d 1188, 1194 (D. Kan. 2007) ("Therefore, the first consideration at step two is what, if any, medically determinable impairments plaintiff has regardless of the credibility of her allegations of the severity of those impairments.").

In this case, the ALJ did not omit consideration of the Plaintiff's mental impairments altogether; rather, he acknowledged Plaintiff's "affective disorder and anxiety disorder" at Step 2 and accepted Dr. Wharry's opinion that "there was insufficient evidence to substantiate the presence of a psychological disorder from November 15, 2005 through July 31, 2009." [AR 21]  The ALJ also gave Dr. Henley's (the consulting examiner) opinion "less weight ... because this examination was performed in May 2010, more than two years after the claimant's date last insured." [AR 30] The Court finds no error by the ALJ in affording less weight to Dr. Henley's opinion, particularly considering that the doctor evaluated the Plaintiff as she appeared in May 2010, and even noted that any cognitive deficits had likely arisen *after* Plaintiff's multiple sclerosis "worsened," which Dr. Henley believed (if read in context with the opinion) occurred the previous year, 2009. *See* AR 535 ("Her [MS] symptoms began two years ago, and she had three flares the first year, then 4-5 last year.").

However, the Court finds problematic the ALJ's reliance on Dr. Wharry's opinion, which itself appears to consider records from Dr. Gilder only back to October 2008.  [AR127]  Whether this was an oversight on Dr. Wharry's part or whether she had no access to earlier records is unclear.

16

In any event, records dating back to the Plaintiff's first meeting with Dr. Gilder in February 2005 exist in the record, and they reflect that Plaintiff was "very distressed and emotional" and the doctor prescribed a daily dose of Prozac. [AR 533] Subsequent records through the relevant period reflect Plaintiff's "anxiety" [AR 986, 942, 531, 528, 524, 522, 513, 511, 510, 507], tearfulness [AR 526, 509], memory lapses [AR 526, 511], difficulty concentrating [AR 522, 519], difficulty finding words [AR 513], agitation [AR 511], and depression [AR 530, 509]. Dr. Gilder treated her with medication for these issues throughout the time period. Accordingly, the Court finds Plaintiff's mental impairments to be medically determinable during the relevant time period, and they should have been considered by the ALJ. *See Wells*, 727 F.3d at 1069.

Further, to the extent that the ALJ accepted Dr. Wharry's opinion that "there was insufficient evidence to substantiate the presence of a [psychological] disorder" for his determination that Plaintiff's impairments were not "medically determinable" under Step 2, such reliance was misplaced since Dr. Wharry's opinion specifically refers to whether Plaintiff's mental impairments "met or medically equaled the severity" of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, which is considered in Step 3. [*See* AR 128-129] Moreover, it appears that Dr. Wharry considered records primarily from October 2008-April 2010 rather than from the relevant time period, November 2005-March 2008 and, thus, it is unclear whether her opinion is supported by the evidence in the record. [*See* AR 127-128] As such, it was error for the ALJ to rely on the opinion to determine whether Plaintiff was disabled during the relevant time period.

In addition, the Court agrees that the ALJ failed to mention the Plaintiff's medically determinable migraine headaches during Step 2 and in subsequent steps of his analysis, particularly

in fashioning the RFC in this case (which was used to garner an opinion from the vocational expert as to Plaintiff's past work in customer service and personnel recruitment). Again, the medical record reflects Dr. Gilder's and other physicians' numerous notations of Plaintiff's headaches and their treatment of them. [*See* AR 1013, 1001, 979, 532-533, 528, 526, 514, 513, 507] *Williams*, 844 F.2d at 751 (a plaintiff need only show that an impairment would have more than a minimal effect on her ability to do basic work activities). Without mention of the impairment in the decision, the Court cannot discern whether the ALJ considered it singly and/or in combination with the other impairments to determine whether Plaintiff was disabled during the relevant time period. *See Walker v. Colvin*, No. 12-cv-235-EJF, 2014 WL 794261, at *7-*8, *12 (D. Utah. Feb. 27, 2014) (remanding matter for ALJ's failure to determine the plaintiff's migraines were medically determinable at step 2 and failure to consider them in subsequent steps).

Typically, "[a]n error at step two of the sequential evaluation concerning one impairment is usually harmless when the ALJ . . . finds another impairment is severe and proceeds to the remaining steps of the evaluation." *Grotendorst v. Astrue*, 370 F. App'x 879, 883 (10th Cir. 2010) (citing *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008)). However, in this case, the RFC itself appears to include limitations only for the Plaintiff's physical impairments (including weakness and dizziness); but, without any indication from the ALJ as to whether he considered Plaintiff's mental impairments or migraines, the Court cannot determine whether the RFC takes such impairments into account. Therefore, the Court must conclude such omissions are reversible error under prevailing law. *See Wells*, 727 F.3d at1069 ("In his RFC assessment, the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not.") (emphasis in original).

18

Because there is no indication the ALJ considered the Plaintiff's mental impairments and migraine headaches during Step 2 and at stages of his analysis subsequent to Step 2, particularly in formulating the RFC and determining whether the Plaintiff could perform her past jobs (including seeking testimony from the experts), the Court will reverse the ALJ's decision on this issue and remand to the Commissioner for further consideration. *See Sissom v. Colvin*, 512 F. App'x 762, 769 (10th Cir. 2013) (citing *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir.1988) and *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir.2004)) (cautioning the ALJ on remand to "make adequate findings" to assure that the correct legal standards are invoked and to ensure a meaningful appellate review).

## II.    Remaining Issues

The Court "address[es] only so much of Plaintiff's arguments as are sufficient to require reversal." *See Cross v. Colvin*, 25 F. Supp. 3d 1345, 1348 n.1 (D. Colo. 2014). The Court expresses no opinion as to the Plaintiff's remaining arguments, and neither party should take the Court's silence as implied approval or disapproval of the arguments. *See Watkins*, 350 F.3d at 1299 ("We will not reach the remaining issues raised by appellant because they may be affected by the [administrative law judge's] treatment of the case on remand."). The Court also does not suggest a result that should be reached on remand; rather, the Court encourages the parties and the ALJ on remand to consider fully and anew the evidence and all issues raised. *See Kepler v. Chater*, 68 F.3d 387, 391-92 (10th Cir. 1995) ("We do not dictate any result [by remanding the case]. Our remand simply assures that the correct legal standards are invoked in reaching a decision based on the facts of the case.") (citation and quotation marks omitted).

With this in mind, the Court notes that its findings as to the ALJ's Step 2 and Step 4 analyses may inform the Commissioner's consideration on remand, particularly as to the Plaintiff's concerns and the Court's findings regarding the ALJ's weighing of the medical opinions in this case.

## CONCLUSION

In sum, the Court must conclude that the ALJ failed to apply the correct legal standards in omitting any consideration of the Plaintiff's mental impairments and migraine headaches, both singly and in combination with her other impairments, from his RFC formulation and determination of whether the Plaintiff could perform her past work.   Therefore, the decision of the ALJ that Plaintiff Angelique Murdock was not disabled during the time period, September 15, 2005 through March 31, 2008 is REVERSED AND REMANDED to the Commissioner for further consideration in accordance with this order.

Dated at Denver, Colorado this 17th day of March, 2016.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge